IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| PATRICIA WEBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 14-4284-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
REVERSING THE DECISION OF THE COMMISSIONER**

Plaintiff Patricia Weber seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title XVI of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in discrediting the

opinions of Dr. Kurle and Dr. Robbins while giving too much weight to the opinion of Dr.

Winkler, and by improperly discrediting plaintiff's subjective complaints.  I find that the

ALJ erred in discrediting the opinion of Dr. Kurle.  Based on his opinion and the

testimony of the vocational expert, I find that the ALJ erred in finding plaintiff not

disabled.

## I.    BACKGROUND

On July 28, 2010, plaintiff applied for disability benefits alleging that she had

been disabled since July 15, 2008, later amended to July 28, 2010.  Plaintiff's

application was denied initially and by an Administrative Law Judge after a hearing.  On

January 18, 2013, the Appeals Council remanded for further consideration.  On August

27, 2013, a second hearing was held before an Administrative Law Judge.  On

November 4, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 4, 2014, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5

2

(8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

3

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, her father, vocational expert Julie Bose, and medical expert Anne Winkler, M.D., Ph.D., in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1981 through 2013:

4

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1981 | $ 33.50 | 1998 | $ 1,875.00 |
| 1982 | 0.00 | 1999 | 1,774.00 |
| 1983 | 402.63 | 2000 | 196.00 |
| 1984 | 5,457.71 | 2001 | 0.00 |
| 1985 | 1,461.00 | 2002 | 1,445.00 |
| 1986 | 4,414.08 | 2003 | 0.00 |
| 1987 | 1,261.29 | 2004 | 0.00 |
| 1988 | 0.00 | 2005 | 0.00 |
| 1989 | 2,454.70 | 2006 | 0.00 |
| 1990 | 0.00 | 2007 | 0.00 |
| 1991 | 0.00 | 2008 | 2,931.75 |
| 1992 | 0.00 | 2009 | 0.00 |
| 1993 | 0.00 | 2010 | 0.00 |
| 1994 | 0.00 | 2011 | 0.00 |
| 1995 | 2,586.00 | 2012 | 0.00 |
| 1996 | 0.00 | 2013 | 0.00 |
| 1997 | 0.00 | | |

(Tr. at 147, 150-151, 154, 172-173).

**Disability Report - Field Office**

On July 28, 2010, R. Wade interviewed plaintiff via telephone in connection with

her disability application (Tr. at 175-177).  The interviewer observed that plaintiff had

problems with answering: "Hard time to get an answer from her. This interview lasted forever. She could not remember any dates."

**Function Report**

The Function Report dated August 17, 2010, is largely illegible due to poor copy quality (Tr. at 186-193). Plaintiff reported that she lies down a lot during the day because most nights she does not sleep well due to chronic pain. She also has trouble sleeping because sometimes she will wake up "choking." She can care for her personal needs and does not require reminders to take care of her personal needs or to take medication. She prepares her own meals with help, she can perform household chores as needed but it takes her a long time and she normally needs to sit while she is doing this, she can go out alone but when she goes out she rides in a car, her family does the shopping, her hobbies include using a computer, she visits with family or talks on the phone every day, and she has no problems getting along with others. Her impairments do not affect her ability to remember, complete tasks, understand, follow instructions, get along with others or use her hands. Her impairments do affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and concentrate, all because of pain and breathing problems.

**Function Report - Third Party**

On August 17, 2010, plaintiff's father completed a Function Report (Tr. at 178-185). Plaintiff is capable of caring for her own personal needs and does not require any reminders for personal care or taking medication. She can prepare her own meals while sitting. She has no problems getting along with others. Her hobbies include

using the computer. Plaintiff's impairments do not affect her ability to understand, follow instructions, complete tasks, remember, get along with others, or use her hands. Her impairments do affect her ability to lift, sit, climb stairs, squat, kneel, stand, bend, reach, walk, and concentrate.

**Independent Living Resource Center Documentation**

On April 25, 2013, plaintiff began receiving assistance through the Missouri Department of Health and Human Services with the following activities:

1.     Bathing (10 minutes per day, 5 days a week)

2.     Cleaning the bathroom (15 minutes per day, once a week)

3.     Changing linens (10 minutes per day, 3 days a week)

4.     Cleaning floors (15 minutes per day, once a week)

5.     Tidying and dusting (5 minutes per day, once a week)

6.     Laundry (60 minutes per day, once a week)

7.     Trash (5 minutes per day, once a week)

8.     Meal preparation (20 minutes per day, 5 days a week)

9.     Washing dishes (10 minutes per day, 5 days a week)

10.     Cleaning the kitchen (15 minutes per day, once a week)

In addition, plaintiff was assisted with 300 minutes of transportation per month for shopping and errands.

(Tr. at 241-242, 639).

7

**American Homecare Progress Report**

On August 23, 2013, Stephanie Schlots,[1] LPN, wrote the following:

I am authorized to see Ms. Weber 1 x week for weekly medication set up, reordering meds when needed and general assessment. I also give her allergy injections as prescribed by the physician.

Ms. Weber requires this assistance as she becomes too anxious, unable to stay on task to fill or take her own medications it becomes too overwhelming for her, she also requires assistance at time[s] to complete phone calls for medical related problems, during conversations she becomes side tracked and cannot remember the reason for phone call.

Under Ms. Schlots's signature, she added the following:

Ms. Weber also suffers from severe depression, meds are making some progress but not enough for her to be independent with her activities of daily living.

(Tr. at 243).

**Letter to whom it may concern**

On August 26, 2013, the following letter was written:

I am employed by Patricia Weber through Independent Living Resource Center to provide housecleaning services as well as personal care for her. My duties include caring for the home, cooking, laundry, running errands and shopping for her. With Ms. Weber's condition, she often becomes confused. Everyday tasks often become more difficult for her because of this confusion. She also lacks the physical stamina to complete household chores as exertion causes her pain.

(Tr. at 244).

---

[1]The nurse's signature is very hard to read; this is my best attempt at the spelling of her last name.

Case 2:14-cv-04284-REL   Document 21   Filed 03/31/16   Page 8 of 67

**B.     SUMMARY OF MEDICAL RECORDS**

On March 3, 2010, plaintiff had a sleep study; it was determined that she did not

have sleep apnea (Tr. at 266, 345).

On April 2, 2010, plaintiff had a CT scan of her chest and abdomen to follow up

on lung nodules and due to complaints of abdominal pain (Tr. at 264, 343).  "Client

looks good - nodules have resolved."  Plaintiff had a possible ovarian cyst.

On May 7, 2010, plaintiff had an MRI of her

lumbar spinal canal due to complaints of back pain (Tr.

at 262, 341, 514).  Travis Scott, M.D., found minimal

disc bulge[2] at the L4-5 level without significant central

canal or neural extraforaminal stenosis (narrowing).



She also had an MRI of her thoracic spinal canal which

showed two hemangiomas[3] in the T9 vertebral body but an otherwise negative study

(Tr. at 263, 340, 515).

On May 27, 2010, plaintiff was seen at Westlake Medical Center (Tr. at 249).

Plaintiff reported that she still has back pain and was trying a massager.  On exam she

was nontender over her lumbar spine.  She was assessed with back pain and told to

continue the massager.  She was assessed with dyspnea (shortness of breath) and the

---

[2]A bulging disk is one in which the tough outer layer of the disk bulges into the spinal
canal.

[3]Vertebral hemangiomas are benign vascular tumors around one or two vertebrae.

records indicate the medical provider was to check her overnight oximetry (blood oxygen level).

On June 29, 2010, plaintiff had laparoscopic surgery to remove her right fallopian tube; she was discharged with a prescription for narcotic pain medicine (Tr. at 330).

On July 10, 2010, plaintiff was seen at Westlake Medical Center (Tr. at 250). Plaintiff reported that it was hard to breathe. She was on Vicodin (narcotic). She said that Wellbutrin (antidepressant) was not helping as much with her mood and had not helped with quitting smoking. She was assessed with chronic obstructive pulmonary disease ("COPD") and her Proventil inhaler was refilled.

On July 22, 2010, plaintiff was seen at by Kathleen Robbins, M.D. (Tr. at 250, 431). Plaintiff reported pain in her neck and back and said she had to sit while folding laundry, but she was also in pain if she sat too long. Plaintiff reported some shortness of breath on exertion. Plaintiff had stopped using her Proventil inhaler because it made her turn red from her neck up to her face. She took her last Prednisone (steroid) the day before and said it did not help. On exam it was noted that her mood was somewhat anxious. She was assessed with back and neck pain and was given a prescription for Cymbalta (antidepressant). Her dyspnea was noted to be stable. Plaintiff also had poison ivy.

July 28, 2010, is plaintiff's alleged onset date.

On August 2, 2010, plaintiff saw Martin Schwartz, M.D., a gynecologist, complaining of ongoing pelvic pain, aggravated by physical activity (Tr. at 297-298, 416-417). Dr. Schwartz observed tenderness in the right lower quadrant but noted that her

10

"pelvic exam is completely negative for any abnormalities.  There's a total lack of tenderness."  He recommended a surgical consult.

That same day plaintiff had x-rays of her cervical spine (Tr. at 261, 322, 400).  She had mild degenerative disc disease at C5-6 (see diagram on page 9).

On August 9, 2010, plaintiff had an MRI of her cervical spine due to complaints of right sided neck pain and headache (Tr. at 399, 513).  The MRI was "totally normal."

On August 11, 2010, plaintiff saw Kathleen Robbins, M.D., for a follow up on the MRI of her cervical spine (Tr. at 430).  "C-spine was good. . . .  Still taking Cymbalta [antidepressant] and hydrocodone [narcotic]."  The examination section of the record reads in its entirety:  "moderate distress secondary to pain though pain seems diffuse and nondescript."  Dr. Robbins assessed neck/back pain and headaches.  Under the doctor's signature is written, "has had bad headaches several times per day. . . .  takes 1 1/2 of the hydrocodone 2-3 times per day.  It helps, not sleeping, up frequently, thinks she had headaches before Cymbalta but they have been worse lately, eye started twitching about a week ago."  Plaintiff still had poison ivy.  Dr. Robbins assessed fatigue and headaches.

On September 30, 2010, plaintiff had an MRI of her brain due to complaints of headaches over the past 4 to 5 months (Tr. at 366, 398, 512).  The MRI showed possible middle ear infection (mastoiditis), chronic sinus disease, a cyst in the right maxillary sinus, and a few small white matter lesions.  "Differential diagnosis includes early small vessel ischemic changes which would be somewhat atypical in a patient of this age."  It was recommended that the MRI be repeated in 3 to 6 months.

On October 7, 2010, plaintiff saw Kathleen Robbins, M.D., and complained of swelling in her left leg; she said she had fractured her tibia 18 years earlier when her leg was run over (Tr. at 429). The results of Dr. Robbins's physical exam consisted of 1+ pedal edema in the left foot, 1+ edema in bilateral lower legs. Plaintiff was assessed with edema "stable" and headaches, although the record does not reflect that plaintiff mentioned headaches. Plaintiff was told to follow up with an ENT and neurologist.

On October 23, 2010, plaintiff went to the emergency room complaining of swelling and pain in her right leg (Tr. at 509-511). She had fallen off the roof of her house two weeks earlier but had not sought medical treatment during that time. She reported that her symptoms improve with movement. In a review of systems, plaintiff reported only depression in her psychosocial history. She was smoking 1 to 2 packs of cigarettes per day and had for the past 30 years. Plaintiff was observed to be alert, calm, fully oriented with normal mood and affect. X-rays were taken and plaintiff was assessed with fracture of the right distal fibula. She was provided with a splint and crutches, was told to use ice and elevate her leg, and she was given a prescription for Vicodin (narcotic).

On October 27, 2010, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 429). Plaintiff said Neurontin[4] made her have mood swings. "Will try to get Lyrica[5] covered." Plaintiff had her leg wrapped in a splint and Ace bandage. Dr. Robbins

---

[4]Also called Gabapentin, used to treat nerve pain.

[5]Used to treat nerve pain.

assessed right fibula fracture, referred plaintiff to Dr. Hoeft, and prescribed Percocet (narcotic) for pain.

On October 28, 2010, plaintiff saw Thomas Hoeft, D.O., for evaluation of her leg after she fell off the roof 18 days earlier (Tr. at 397). Dr. Hoeft recommended using a walker boot and repeating her x-rays in one to two weeks.

On November 10, 2010, plaintiff saw Kathleen Robbins, M.D. (Tr. at 429). "Need to get Lyrica, applying for disability, joints hurting, left shoulder bothering her." Plaintiff hurt her finger by catching it in a door, but it was getting better. She said Cymbalta (antidepressant) seemed to help when she first started it, but it was no longer helping. On exam she was noted to be in moderate distress due to pain. Her mood was OK, her affect was appropriate. She had "mild" tenderness in her joints. The assessment part of the record was cut off in copying.

On November 15, 2010, plaintiff had a pulmonary function test which showed "possible mild obstructive ventilatory impairment. There may be mild obstructive change as shown by the slight decreased flow rates but the patient effort is not optimal. There was no improvement with bronchodilator."

On November 17, 2010, plaintiff saw Philip Kurle, M.D., a neurologist (Tr. at 487-491, 500-508).

> Insofar as the patient's headaches, she says she suffered from headaches for many years. These worsened around July 2010. . . . She can have two to three headaches in a day. She has a headache about three to four days per week. The last was one to two days ago. She rates these up to 10/10 at times. She feels as if her head wants to explode. Sometimes the pain is sharp and stabbing. It may throb. There is associated photo- and phonophobia. Sometimes the patient sees squiggly lines. She has blurred vision. There is no

13

nausea or vomiting. Sometimes she feels confused during her headaches. She is using hydrocodone [narcotic] at times to treat these. She is taking one about every four to six hours most days. She generally needs to lie down in a quiet place.

The patient also complains of symptoms consistent with fibromyalgia. She says that her joints hurt everywhere. She feels that this started in her hands. It is gradually worsened over the past year or so. She also reports that she has chronic back pain. She has pain suggestive of sciatica extending down the right posterolateral leg. It is worse with activity. It is rated 4-5/10.

The patient has tingling in her hands, especially at night. . . . This seldom bothers her during the day.

The patient also says she fell off a roof on October 10, 2010. . . . Apparently she was cleaning some gutters when a branch that she was using to stabilize herself snapped.

The patient also complains of mood and behavioral issues. She feels that these are worse in the past year. The patient mentions she was treated on Cymbalta primarily for her fibromyalgia, though possibly also for her mood. She is using alprazolam[6] for anxiety. She said that she is sleeping poorly."

During a review of systems, plaintiff reported a positive result for "48 of 90 possible issues. I am not going to detail all of these 48 issues here, but I did review each and every one of them with the patient during our visit." Plaintiff reported being a current smoker and smoking 1 1/2 packs of cigarettes per day for the past 25 years. On exam it was noted that plaintiff "is a pleasant, engaging, moderately obese, middle-aged woman in occasional distress and appearing uncomfortable at times, and she attributes this to 'joint pain all over.'" She had some stiffness in her neck in all directions. Her lungs were clear to auscultation bilaterally. Her cardiac exam was normal. Her extremities were normal with no edema. During a mental status exam, Dr.

_____

[6]Also called Xanax.

14

Kurle observed that plaintiff was "alert and oriented to person, place, time and situation. She had 3/3 registration and 3/3 recall with good attention for backward spelling. Her speech was fluent with good naming and repetition. Her mood and affect seemed overall reasonably appropriate, though she was somewhat anxious. She had a good fund of general knowledge and knew the president." Motor exam, sensory exam, coordination exam were normal. Gait and station were normal "although there was some sidestepping during tandem gait. There was good heel and toe walking." Dr. Kurle reviewed plaintiff's September 2010 MRI of the brain.

> IMPRESSION AND PLAN: We discussed a range of potentially neurological concerns today. The patient is most concerned about the MRI of the brain. I explained that the types of white matter changes seen on the MRI are quite common and increasingly recognized in patients who have chronic migrainous headaches. They are presumably attributable to the low-grade migrainous vasospasm. The patient does have a history of head trauma, and it is possible this could represent an old traumatic lesion, thought I think it is an unusual location for such a lesion. A demyelinating lesion is less likely but cannot be excluded. Likewise, a low-grade glioma would be yet another more remote consideration. These final two considerations, however, compel me to repeat an MRI of the brain with and without contrast in about three months for surveillance.

> Dr. Kurle told plaintiff there was no reason to be taking Lyrica (treats nerve pain) three times a day as she currently was. He switched her dosage from 50 mg three times a day to 150 mg once a day. He told her to wear wrist braces at night.

On November 21, 2010, Kathleen Robbins, M.D., completed a Medical Source Statement Physical (Tr. at 368-371). She found that plaintiff could lift 5 pounds frequently and 10 pounds occasionally; stand or walk a total of 2 hours per day and 30 minutes at a time; sit for a total of 4 hours per day and 60 minutes at a time; and would need to alternate sitting and standing, elevate her feet, and recline during the day. She

15

found that plaintiff is limited in her ability to push and pull -- "fairly limited due to back/neck problems and arthritis in joints."  She found that plaintiff could occasionally stoop, kneel, crouch or bend, but she could never climb or balance.  She found that plaintiff was limited in her ability to reach but had an unlimited ability to handle, finger, or feel.  She found that plaintiff could not safely work around heights or with machinery due to joint pain and back/neck problems.  "Pain prevents pt from lifting/carrying or standing/sitting for prolonged periods."  In addition, plaintiff suffers from anxiety and shortness of breath due to COPD which may interfere with a regular work day.

On November 30, 2010, plaintiff saw neurologist Philip Kurle, M.D., who prescribed bilateral hand splints to be worn at night, and on December 6, 2010, that prescription was faxed to Medicaid on a "certificate of medical necessity." (Tr. at 484-486).

On December 6, 2010, plaintiff saw Steven Adelman, Psy.D., a licensed clinical psychologist, for an assessment in connection of her application for benefits (Tr. at 444-446, 733).  Dr. Adelman made the following recommendations:  "She does have the signs and symptoms of panic disorder and depression.  It appears that her lifestyle is fairly impaired due to the breathing problems and the pain that she perceives.  She has the ability to understand and follow simple instructions, but would have problems with detailed ones.  It is doubtful that she could withstand the normal stresses of a workplace or relate predictably in vocational or social situations due to her panic disorder."  The only basis in this record for a diagnosis of panic disorder was plaintiff's

report that she has panic attacks, and up to this point plaintiff had never reported panic attacks to any treating doctor (Tr. at 444).

On December 22, 2010, plaintiff saw Kathleen Robbins, M.D. (Tr. at 428). "Joints still hurting a lot, pain meds not helping, on hydrocodone 10/325 mg lately taking 4-5 day, a lot of headaches lately." The notes on Dr. Robbins's observation are one line long and are illegible. She assessed fibromyalgia and prescribed Percocet (narcotic) and Ambien (treats insomnia). She assessed "headaches - will monitor". She assessed "dizziness - better today" after plaintiff described dizziness as what she believed was a side effect to medication prescribed by Dr. Kurle.

On December 23, 2010, plaintiff saw Douglas Howland, D.O., with complaints of headaches, post nasal drip and sinus congestion (Tr. at 452-453). During a review of systems, plaintiff reported chest pain, shortness of breath, cough, wheezing, tuberculosis, COPD, weight gain, loss of appetite, fever, allergy symptoms, fatigue, insomnia, leg edema, exercise intolerance, hives, sensitive skin, hot/cold intolerance, swelling, excessive thirst, frequent urination, hand growth, hearing loss, change in voice, sore throat, ringing in the ears, speech delay, trouble swallowing, troubling breathing, dental pain, nausea, vomiting, abdominal pain, diarrhea, constipation, easy bruising, swollen glands, night sweats, hemophilia, joint swelling, leg cramps, arthritis, neck pain, back pain, headache, migraines, imbalance, weakness, numbness, red eyes, vision changes, depression, anxiety, mood swings, ADHD, and autism. She reported that she smokes and uses alcohol. Her medications included Percocet

(narcotic), Ambien (treats insomnia), Lasix (diuretic), Norco (narcotic), Phentermine,[7]

Ultravate (steroid), Combivent inhaler, Spiriva (bronchodilator used to treat COPD),

Lyrica (for nerve pain), Advair Diskus (treats COPD). On exam plaintiff was noted to be

cooperative, alert and oriented, in no apparent distress. She had normal range of

motion in her neck. Dr. Howland assessed headache and chronic sinus infection not

otherwise specified. He ordered a CT scan of plaintiff's sinuses and recommend that

she use a sinus irrigation in her nose daily.

On December 30, 2010, plaintiff had an MRI of her brain due to complaints of

chronic headaches and to follow up on a while matter lesion, after having been referred

by Philip Kurle, M.D. (Tr. at 362, 492). "Small white matter lesions are unchanged since

9/30/10 and do not enhance; these are most likely migraine-induced microvascular

changes and/or small infarcts." Plaintiff had signs of chronic sinus infection. "No new

abnormalities are identified." She also had a CT scan of her sinus which showed

postoperative changes and signs of chronic sinusitis (Tr. at 365, 451).

On January 3, 2011, Philip Kurle, M.D., a neurologist, wrote a letter to Kathleen

Robbins, M.D., after plaintiff's follow-up visit that day for headaches and other issues

(Tr. at 381-383, 479-483). "We primarily talked about her migrainous headaches, I also

feel that likely she has bilateral low-grade carpal tunnel syndrome. She has sciatica

and presumed lumbar degenerative disc disease. She has a region of abnormality in

---

[7]Phentermine is a stimulant similar to an amphetamine. It acts as an appetite
suppressant by affecting the central nervous system. Phentermine is used together
with diet and exercise to treat obesity in people with risk factors such as high blood
pressure, high cholesterol, or diabetes.

the right frontal region of her MRI. She likely has fibromyalgia as well as depression and anxiety." Dr. Kurle noted that plaintiff's recent MRI was unchanged from the one done in September. "[T]he regions of white matter abnormality within the right frontal lobe . . . are nonspecific. It remains my suspicion that these are related to low-grade vascular changes, which are actually themselves stemmed from the patient's migraines and associated low-grade recurrent migrainous vasospasm. This is a recently well-known and well-published potential sequelae of chronic migraines. So far there is no good evidence of a demyelinating condition.[8] I tried to reassure the patient about this." Plaintiff described an "episode" she had after her last visit, "[t]he nature of which is a little uncertain to me." She said she went into the bathroom and felt as if it were blowing up, she felt as if there were strands of water coming off her hair, she went back to bed and felt hot, then she got hot and cold flashes before getting a severe headache. These symptoms resolved after a few hours. "She has not been evaluated since that time." Plaintiff reported continuing to have significant migrainous headaches three to four times per week. She reported some tingling and discomfort in her hands and fingers. "Since starting on Lyrica she is, however, not having as many diffuse aches and pains. She is not taking her hydrocodone or oxycodone pain medications as much."

---

[8]A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in the brain and spinal cord. When the myelin sheath is damaged, nerve impulses slow or even stop, causing neurological problems.

On exam plaintiff was described as pleasant and somewhat tired-appearing. Her psychiatric and neurological exams were normal; gait and station were normal. Dr. Kurle reviewed plaintiff's blood work from November 2010 and noted that her B12 level and Vitamin D level were low. He diagnosed chronic migrainous headaches, fibromyalgia "improved to some degree on Lyrica," likely bilateral low-grade carpal tunnel syndrome, lumbar degenerative disc disease with sciatica "stable," abnormal MRI, depression and anxiety, and vitamin D deficiency. Dr. Kurle prescribed Topiramate daily to prevent migraines, Midrin to take at the onset of any migraine, and he told her to start taking a Vitamin D and calcium supplement daily. He also told plaintiff to drink at least eight 8-ounce glasses of water per day.

On March 29, 2011, plaintiff saw Philip Kurle, M.D., a neurologist, who then wrote a letter to Kathleen Robbins, M.D. (Tr. at 379-380, 477-478, 522-523). "There is a region of abnormality in the right frontal lobe seen on prior MRI, which is of doubtful significance. This may be related to the migrainous headaches themselves. . . . Today Ms. Weber reports that she had been doing reasonably well after our last visit, but her headaches have been worsening over the past four to five days. The pain is behind her right eye. It seems to extend to her neck. She is taking Lyrica 150 mg twice daily. Previously I had prescribed her some butalbital[9] and Midrin. These seemed to make her sick. The patient feels confused and forgetful. She has trouble spelling simple words. She feels her memory is poor. She feels her mood is up and down. She feels easily overwhelmed and frustrated."

---

[9]Butalbital is a barbiturate, a central nervous system depressant.

On exam plaintiff was described as pleasant, engaging and tired-appearing. Her lungs were clear to auscultation. Her psychiatric exam was normal. Neurological exam was normal. Dr. Kurle told plaintiff to restart Topamax daily for her headaches, he gave her a trial of Savella (antidepressant and nerve pain medication) for fibromyalgia, he gave her a trial of gabapentin (also called Neurontin, for nerve pain). "The patient has this prescribed but is not using it routinely. She may take one to three of the 400 mg capsules up to three times a day as needed for headaches."

On April 20, 2011, plaintiff saw Kathleen Robbins, M.D., with a chief complaint of "needs Percocet" (narcotic) (Tr. at 427-428). Plaintiff said her knees had been bothering her, and she had pain in her groin and pelvis. Plaintiff reported "bad side effects" from Topamax. The results of Dr. Robbins's physical exam were soft nontender abdomen with normal bowel sounds, and clear chest. She assessed knee pain and refilled plaintiff's "pain meds".

On May 19, 2011, plaintiff saw Zubair Khan, M.D., a cardiologist, for a follow up (Tr. at 395-396). "According to the patient, she has been having problems with increasing shortness of breath. She denies any problems with chest pain, orthopnea,[10] paroxysmal nocturnal dyspnea,[11] presyncope[12] or syncope.[13] On her last visit, patient

---

[10]Shortness of breath when lying flat.

[11]Attacks of severe shortness of breath and coughing that generally occur at night, usually awakening the person from sleep.

[12]Lightheadedness and feeling faint.

[13]Fainting.

was encouraged to bring along her medication list.  On today's visit, patient, once again, is not aware of her current medication, and was once again encouraged to bring along her medication on her next visit."  On exam plaintiff was noted to appear comfortable.  Her pulmonary exam was normal:  "Normal bilateral chest expansion, good bilateral air entry, normal vesicular breathing bilaterally, no wheezes or crackles noted."  Plaintiff was assessed with shortness of breath probably related to cardiomyopathy (abnormal heart muscle), cardiomyopathy, and COPD.  Dr. Khan prescribed Lasix (diuretic), K-Dur (potassium), and Lisinopril (treats hypertension).

That same day plaintiff saw Kathleen Robbins, M.D., complaining of "intense pain in knees; pain lower abdomen/pelvis on right" and pain in her right buttock making it hard to sit (Tr. at 427).  No exam was performed, but Dr. Robbins's observation was that plaintiff was in no acute distress.  She assessed arthralgia (joint pain) and refilled plaintiff's "pain meds".

On June 3, 2011, Philip Kurle, M.D., a neurologist, wrote a letter to Kathleen Robbins, M.D., after plaintiff's appointment that day (Tr. at 377-378, 475-476, 520-521).

> At the time of the patient's last visit we made some changes in the patient's medication.  The patient was titrated up on Topamax.  She felt that this made her irritable, confused and forgetful.  With that being said, her migrainous headaches seem to be a little better.  They are not going on for as long.  She has had two or three headaches this week but they only last a few hours, rather than all day.  The pain is rated 5-6/10.  It is felt primarily occipital, but may also nave a pressure behind the eyes.  There is associated photophobia and phonophobia.

> The patient also reports that her legs feel weak and painful in the mornings.  She is using elbow pads and braces.  She is not using her wrist splints for carpal tunnel syndrome. . . .  The patient continues to have some pain shooting down the back of her right leg consistent with sciatica.

22

When I last saw the patient, I had recommended starting Savella for her fibromyalgia. Unfortunately, insurance would not cover this.

Plaintiff also complained of pain in her knees, worsened with weightbearing, and she "feels her knees are swollen." On exam plaintiff was observed to be a pleasant, engaging woman in no apparent physical distress. Her psychiatric exam was normal. Grip strength was normal bilaterally. She had diminished sensation in the 1st, 2nd and 3rd fingers of both hands. Gait and station were normal. Plaintiff was assessed with the following:

1. Fibromyalgia.

2. Migrainous headaches, under less than optimal control.

3. Bilateral carpal tunnel syndrome.

4. Lumbar degenerative disc disease.

5. Right frontal MRI abnormality, probably related to migraines.

6. Ongoing issues with depression and anxiety.

7. Prior vitamin D deficiency. The patient has not yet started adding a vitamin D supplement.

Plaintiff was given Lidoderm (anesthetic) patches to apply to painful areas, a trial of methocarbamol (muscle relaxer) for muscle tension, back exercises, a prescription for wrist and knee splints and braces, and she was given a prescription for citalopram (antidepressant) to start in a week. She was told to start riboflavin (vitamin B2) and ergocalciferol (vitamin D2) daily.

On June 10, 2011, plaintiff had a cardiac stress test which showed an area of the heart muscle getting reduced blood supply, ejection fraction[14] of 62%; and normal myocardial (heart muscle) thickening and wall motion (Tr. at 394).

On June 23, 2011, plaintiff saw John Patton, D.O., for evaluation of a possible hernia (Tr. at 388-391, 463-466). Plaintiff reported smoking a pack of cigarettes a day and occasional alcohol use. She said she was applying for disability because of her fibromyalgia and COPD. On exam her lungs were clear to auscultation bilaterally, her breathing was nonlabored. "The patient has essentially normal spinal curvature of the cervical, thoracic, and lumbar spine. Range of motion of extremities is grossly intact. Gait is even and steady." Dr. Patton recommended laparoscopic surgery to see if a hernia was present.

On June 30, 2011, plaintiff saw Kathleen Robbins, M.D., for a check up (Tr. at 427, 537). Plaintiff said Dr. Kurle had put her on lidoderm patches which help. "Lyrica helps too." Under observation, Dr. Robbins noted only that plaintiff's heart was OK and her lungs were clear. She assessed fibromyalgia and continued plaintiff's "current meds." Plaintiff also had poison ivy.

---

[14]Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts. During each heartbeat pumping cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it never is able to pump all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber that pumps oxygenated blood through the ascending (upward) aorta to the rest of the body, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal.

On July 22, 2011, John Patton, D.O., performed a diagnostic laparoscopy and determined that plaintiff had a small ventral hernia,[15] about 1 cm in size (Tr. at 469-471).

On August 9, 2011, plaintiff saw John Patton, D.O., for a follow up (Tr. at 386-387, 472-474). She was referred to Martin Schwartz, M.D., a gynecologist, due to discovery of an ovarian cyst during the laparoscopic surgery (Tr. at 412-414). Dr. Schwartz noted that plaintiff was a current every-day smoker. Plaintiff reported her current medications as Albuteral (bronchodilator which treats COPD), Cymbalta (antidepressant and nerve pain medication), Spiriva (bronchodilator), and Xanax (anti-anxiety medication). Dr. Schwartz recommended removal of the ovarian cyst -- it "may or may not be the cause of her left lower quadrant pain".

On August 12, 2011, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 426, 536). Plaintiff said she was still in a lot of pain from her laparoscopic surgery and was taking four Percocet (narcotic) per day. Plaintiff described her back pain as "bad" and said the Lidoderm patches were not helping at all. She could not sleep due to pain. Plaintiff said Wal-Mart still did not have the Lyrica (treats nerve pain) she had been prescribed for pain. Her insurance would not pay for the knee braces prescribed by Dr. Kurle and both of her knees give out. On exam the only abnormal finding was bruising on plaintiff's abdomen from the laparoscopic surgery. Dr. Robbins assessed back pain and refilled plaintiff's Percocet. Plaintiff also had poison ivy.

---

[15]A ventral hernia is a bulge through an opening in the muscles on the abdomen.

On August 18, 2011, plaintiff saw Zubair Khan, M.D., a cardiologist, for a follow up (Tr. at 392-393). "According to the patient, she has generally been doing well. She reports her shortness of breath has improved. She denies any problems with chest pain. Since the patient's last visit, the following testing has been completed: Cardiac stress test". On exam plaintiff was noted to appear comfortable. Her physical exam was normal including her pulmonary exam: "Normal bilateral chest expansion, good bilateral air entry, normal vesicular breathing bilaterally, no wheezes or crackles noted." She was assessed with shortness of breath probably related to cardiomyopathy (abnormal heart muscle), cardiomyopathy with subsequent improvement, and COPD. Treatment was deferred unless plaintiff's condition worsened. "In the meantime, will encourage patient to consider smoking cessation."

On August 24, 2011, plaintiff saw Kathleen Robbins, M.D., complaining of a rash and allergies (Tr. at 426, 536).

On September 2, 2011, plaintiff saw Kathleen Robbins, M.D., complaining of a sore throat (Tr. at 425, 535). Dr. Robbins examined plaintiff's head, eyes, ears, nose and throat. She assessed upper respiratory infection (for which she prescribed antibiotics), COPD (for which she prescribed Symbacort), and a rash (for which she prescribed Prednisone tapes).

On September 22, 2011, plaintiff saw Martin Schwartz, M.D., for a pre-op physical (Tr. at 409-411, 624-625). Plaintiff was noted to be a current every-day smoker and a homemaker. Her pulmonary exam was normal. Her cardiac exam was normal. A physical exam of her back showed no tenderness on palpation, no muscle

spasm, no costovertebral angle tenderness.



On September 27, 2011, plaintiff had a hysterectomy performed by Martin Schwartz, M.D. (Tr. at 407-408, 610-611). The following day she had chest x-rays due to complaints of fever; the x-rays were normal (Tr. at 404, 604). Plaintiff's records reflect that she continued to smoke 1 to 2 packs of cigarettes per day (Tr. at 606). While in the hospital, it was noted that "the rest of her medical problems of migraines, chronic obstructive pulmonary disease, hypertension, dyslipidemia, arthritis, depression, appear to be stable at this time." (Tr. at 600). On September 30, 2011, while still in the hospital, plaintiff saw Rene Galan, M.D., and during a review of systems reported experiencing all of the following: chills, malaise, night sweats, weakness, shortness of breath, wheezing, chest pain, palpitations, nausea, vomiting, dysuria, urinary frequency, arthralgia, bruising, change in speech, confusion, anxiety, depression, cold intolerance, heat intolerance, and anemia. However, on exam plaintiff was noted to be alert and fully oriented, cooperative, in no acute distress, in no respiratory distress, her lungs were clear, her cardiology exam was normal with normal heart sounds, she had no tenderness or edema in her extremities, her speech was normal (Tr. at 616). "She is not smoking at present and is encouraged to cease tobacco use." (Tr. at 618). By October 1, 2011, plaintiff still had a fever (Tr. at 598-599). She denied neck pain (Tr. at 606). She had a mild headache. On exam her lungs were normal with no wheezing or crackles. She had normal heart sounds and no ankle edema. She was assessed with fever, postoperative anemia, hypokalemia (low

27

potassium) and depression. "The rest of her medical problems appear to be stable at this time." (Tr. at 608). Plaintiff was given antibiotics.

On October 6, 2011, plaintiff saw Martin Schwartz, M.D., for suture removal from her surgery to remove an ovarian cyst (Tr. at 402-403). Plaintiff was noted to be a current every-day smoker.

That same day she saw Philip Kurle, M.D., a neurologist, for a follow up on fibromyalgia (Tr. at 549-550). Her headaches were unchanged and ongoing. "The higher dose of Lyrica has been very helpful. . . . Migraines have improved to some degree. She feels that the riboflavin [has] been helpful. The patient reports that the lidoderm patch helps. The patient had a hysterectomy on 9-27-11. She is sleeping poorly." Her entire exam was normal including clear lungs, normal gait, a pleasant general appearance. Dr. Kurle assessed fibromyalgia, depression, unspecified back pain, and "other forms of migraine without mention of intractable migraine with status migrainous."[16] He prescribed Savella (antidepressant and nerve pain medication).

On October 10, 2011, plaintiff saw Kathleen Robbins, M.D., complaining of a rash (Tr. at 425). "Breathing is OK. . . . still having headaches." No exam was performed. Dr. Robbins assessed fibromyalgia and back pain and refilled plaintiff's medications (but did not indicate what those medications were). She also assessed COPD "stable" and headaches "unchanged". That same day plaintiff was notified by Independent Living Resource Center, Inc., that she was eligible for services (Tr. at

---

[16]Intractable migraine with status migrainosus means a migraine headache lasting at least 72 hours.

357). "The criteria for being eligible for Independent Living services, is having a disability and an unmet need."

On October 19, 2011, plaintiff saw Kathleen Robbins, M.D. (Tr. at 535). Plaintiff reported that her breathing was OK. She said she was still having headaches. Dr. Robbins noted that plaintiff was in no acute distress and that her lungs were clear. No other exam was noted. She assessed fibromyalgia and refilled plaintiff's "meds". She assessed back pain and noted that plaintiff's COPD was stable and that her headaches were "unchanged."

On November 18, 2011, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 534). Plaintiff reported pain in her upper chest, burning and tingling in the bottom of her feet, snapping of her joints, pain in her groin, pain with lifting, gums turning dark and sore, and "needs wrist braces due to wrist pain." Dr. Robbins's exam consisted of looking at plaintiff's head, eyes, ears, nose and throat. She observed discoloration of gums. She assessed groin pain, neuropathy vs. carpal tunnel, and fibromyalgia for which she refilled plaintiff's "meds."

On December 12, 2011, plaintiff had a CT of her pelvis after complaints of pelvic and right groin pain (Tr. at 597). The CT was normal.

On December 19, 2011, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 534). Plaintiff said that she needed a back brace that extended from her low back to her neck, she needed a nerve conduction study, and she "would like to try 37.5 mg phentermine", an appetite suppressant. No exam was performed. Dr. Robbins noted only that plaintiff was in "no acute distress." She assessed fibromyalgia and refilled

29

plaintiff's Percocet (narcotic). She assessed back pain and prescribed a back brace. She increased plaintiff's Phentermine to 37.5 mg.

On January 19, 2012, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 533). She reported itching and sinus/allergy symptoms. "Has been waiting for State to approve nurse giving allergy shots." Dr. Robbins examined plaintiff's head, eyes, ears, nose and throat. No abnormal observations were noted. She assessed back pain and refilled plaintiff's "meds".

On February 28, 2012, plaintiff saw Philip Kurle, M.D., a neurologist for a follow up (Tr. at 545-548). Plaintiff reported that Nortriptyline (antidepressant and nerve pain medication) was causing a rash on her legs and face. "At the time of our last visit, the patient was prescribed Savella. She feels that this caused nausea and vomiting. We then tried Cymbalta, and she feels that this also made her feel 'sick.' We then tried topiramate, and the patient wondered (retrospectively) about whether or not this was helpful or causing problems. In December we had tried nortriptyline. This caused some mood changes, but the patient has continued to take it. She feels that it is making her feel tired. . . . The patient is not sure that methocarbamol [muscle relaxer] is of any benefit. The patient feels that Phentermine [appetite suppressant] helps her stay awake. It has not been of any benefit for her weight." Plaintiff said her mood was getting worse and described one or two days when she "just exploded." Plaintiff said it was hard to walk and her knees hurt. "She is tearful that she feels that she is losing ground." Plaintiff said she was generally not feeling well, her thinking was cloudy, she was having more generalized pain, more neck pain, frequent migrainous headaches.

She complained of numbness and burning in her feet, swollen ankles, achy joints, a rash on her ankle, a painful right hip, and painful groin. Plaintiff was not taking her Ambien (sedative) every day. She was using oxycodone (narcotic) 2 to 3 times per day and alprazolam (anti-anxiety) once or twice a day. "Lidoderm [local anesthetic] is of some help for her back pain. The patient is still smoking, but she feels that she has cut down. She has some hopes to quit by April, but she really does not have any specific plan." Plaintiff's entire exam was normal. Dr. Kurle ordered lab work. He told plaintiff to stop taking Nortriptyline, increase her Lyrica and follow up in 4 months.

On February 29, 2012, plaintiff saw Kathleen Robbins, M.D., for a follow up on broken teeth (Tr. at 533). Plaintiff also complained of pain in her right hip. Dr. Robbins observed tenderness in plaintiff's right hip. The only other observation was that plaintiff was in no acute distress. Dr. Robbins assessed allergies, back pain (for which she refilled plaintiff's Percocet, a narcotic), and fibromyalgia which she noted to be "stable."

On May 30, 2012, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 532). Plaintiff needed dental treatment due to black gums and broken teeth; however, Medicaid would not cover that. "Having migraines, has numbness in feet, Dr. Kurle doesn't feel she needs nerve conduction study (per patient), having migraines." Dr. Robbins examined plaintiff's head, eyes, ears, nose and throat. She noted only that plaintiff had multiple dental caries (tooth decay/cavities). She assessed back pain and fibromyalgia and refilled plaintiff's Percocet. She prescribed an antibiotic for plaintiff's gums.

On June 12, 2012, plaintiff saw Steven Adelman, Psy.D., a licensed clinical psychologist, in connection with her Medicaid benefits (Tr. at 705-707, 733). Plaintiff reported having panic attacks in the recent past. Dr. Adelman performed a mental status exam. He assessed major depressive disorder (moderate) and panic disorder. "She does have the signs and symptoms of major depressive disorder, which appears to be associated to pain. She also appears to have a severe amount of anxiety. It is doubtful she could withstand the normal stresses or relate predictably in most vocational or social situations." Again, the only mention of panic attacks in the record is during plaintiff's visit with Dr. Adelman on this occasion and two years earlier, both in connection with applications for benefits.

On June 26, 2012, plaintiff saw Philip Kurle, M.D., a neurologist (Tr. at 542-544). Plaintiff complained of fibromyalgia which she described as "painful and annoying," weight gain on Lyrica, depression due to being tired, and back pain. Plaintiff reported having previously had gastrointestinal problems with Cymbalta and Savella. "Lyrica has seemed to be of some significant benefit, though she feels it is a little less effective over time. She feels very fatigued on this medication. Overall, however, the patient feels that the benefits of Lyrica for her pain outweigh the side effects, such as fatigue. She admits that she has had issues with chronic fatigue even before starting the Lyrica. Nonetheless, she still falls asleep frequently during the day." Plaintiff reported being less able to walk due to pain, which caused her to be more sedentary. Plaintiff said her migraines were less frequent, about 4 or 5 per month, but "disabling" when they occur. Dr. Kurle noted that in October and November 2011, plaintiff had been tried on

32

Topiramate but plaintiff said her thoughts were speeding and, even at a reduced dose, she reported mood changes. Plaintiff had been going through a difficult time back then and now believed that it was "quite possible that her thinking problems and other potential mood changes were probably due to reasons other than medications." She wanted to try Topiramate again. Plaintiff said methocarbamol was not helpful for her muscle cramps and spasms but that Dr. Robbins had put her on Tizanidine and this was helpful and relaxed her but plaintiff felt it was contributing to her sleepiness. Plaintiff said the has always had some modest problems with attention. "The patient may forget what she was doing. She often stops tasks before they are completed. Part of this is that she feels that she simply runs out of energy." Plaintiff said that attention deficit disorder runs in her family, with 2 siblings and all 4 of her daughters having been treated for ADD. Plaintiff's entire exam was normal except that she was noted to be "tired appearing." She was assessed with "Attention Deficit" along with disturbance of skin sensation, fibromyalgia, depression, unspecified back pain, degenerative disc disease, other forms of migraine without mention of intractable migraine and "other malaise and fatigue." He prescribed Camdenton cream for fibromyalgia. He prescribed Topiramate for migraines. He prescribed Methylphenidate (also called Ritalin) for attention deficit.

On June 29, 2012, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 582-584). Plaintiff complained of abscessed teeth. She also reported lower back pain, "wears lidocaine patches, too hot for brace right now." The results of plaintiff's physical exam were as follows: overall appearance - normal; lumbar spine - tenderness;

33

orientation - oriented to time, place, person & situation.  Appropriate mood and affect.
Poor insight.  Poor judgment."  Dr. Robbins assessed fibromyalgia - "medications
refilled."  She assessed lumbosacral pain and told plaintiff to "continue current
medications."  She refilled plaintiff's antibiotic for her dental abscess.

On July 2, 2012, plaintiff had nerve conduction studies which showed right
cubital tunnel syndrome[17] (Tr. at 679-680, 685-686).  "Lower extremity [results] were
unobtainable due to edema."  Plaintiff had not taken her diuretic that morning (Tr. at
579-581).

On July 23, 2012, plaintiff had a repeat nerve conduction study in her legs which
showed right peroneal axonal neuropathy[18] (Tr. at 681-682).  The nerve conduction
study on her upper extremities showed improved cubital tunnel syndrome.

On August 2, 2012, plaintiff saw Kathleen Robbins, M.D., for a follow up on
fibromyalgia and back pain (Tr. at 579-581).  "Had nerve conduction study but didn't
take her water pill that morning. Too much edema to get results on lower extremities."
Plaintiff's complaints consisted of edema, headache, numbness in extremities, back
pain and joint pain.  Her physical exam consisted of the following:  "Well developed.
Normal range of motion, muscle strength and stability in all extremities with no pain on

---

[17]Cubital Tunnel Syndrome is a condition that involves pressure or stretching of the
ulnar nerve (also known as the "funny bone" nerve), which can cause numbness or
tingling in the ring and small fingers, pain in the forearm, and/or weakness in the hand.
The ulnar nerve runs in a groove on the inner side of the elbow.

[18]The peroneal nerve originates in the sciatic nerve and supplies nervous energy
and stimulation to the calf and foot.  Neuropathy is a general term denoting functional
disturbances and pathological changes in the peripheral nervous system.

inspection. No edema is present." Dr. Robbins assessed fibromyalgia and refilled plaintiff's "meds." She noted that she would try to reschedule plaintiff's lower extremity nerve conduction studies, although the record shows that the nerve conduction study had already been repeated successfully.

On August 31, 2012, plaintiff saw Kathleen Robbins, M.D., for a one-month medication check (Tr. at 576-578). "Pain stable on current meds." The results of physical exam consisted of the following: Overall appearance is ill appearing; dental pain. Dr. Robbins assessed fibromyalgia and refilled plaintiff's "meds". She assessed dental abscess and prescribed antibiotics.

On September 11, 2012, plaintiff had a pre-op cardiac stress test (Tr. at 626-627). Plaintiff exercised for one minute and achieved a heart rate of 110 beats per minute. Her myocardial perfusion imaging was "abnormal."

On October 4, 2012, plaintiff saw Kathleen Robbins, M.D., for a follow up (Tr. at 573-575). Plaintiff reported that her back pain had gotten worse, was severe. She had numbness in her extremities. She reported pain in all of her joints. Plaintiff said she was "[i]n tears at times due to pain. Took knee braces back because they were falling down." Plaintiff described her headaches as severe and worsening. The results of her physical exam consisted of "overall appearance - normal; lumbar spine - tenderness." Dr. Robbins assessed back pain. "Medications refilled. May need further imaging studies. Will consider long-acting pain medications." She assessed fibromyalgia, "stable on current medications." She assessed arthralgia (joint pain) for which she told plaintiff to "continue current medications."

35

That same day plaintiff saw cardiologist, Zubair Khan, M.D., for a follow up (Tr. at 691-692).  Plaintiff reported occasional chest pain, lasting 5 to 6 seconds, and shortness of breath.  Plaintiff said she was able to walk up to 1 to 2 blocks on level ground at a regular pace with no shortness of breath.  "Patient denies any problems with orthopnea, paroxysmal nocturnal dyspnea, ankle swelling, presyncope or syncope."[19]  Plaintiff denied dysphagia (difficulty swallowing), muscle or joint pains, stiffness, swelling, limitation of movement, presyncope (lightheadedness), syncope (fainting), weakness, numbness, or tingling (Tr. at 692).  Plaintiff said she had been taking her medication regularly without side effects.  "Cardiovascular stress test was performed on 09/11/12 which reveals size is small, severity is moderate, location of defect is the apical wall, type of defect is periinfarction ischemia, EF of 59%." (ejection fraction, see footnote 14 on page 24).  Echocardiogram performed on 08/02/12 revealed normal LV [left ventricular] function, no significant valvular stenosis [narrowing] or regurgitation,[20] no pericardial effusion [fluid around the heart]."  On exam plaintiff was noted to be comfortable, in no acute distress, her heart sounds were normal, her lungs were normal with no wheezes or crackles, she had normal pulses and no edema.  She was assessed with unstable angina.  Dr. Khan "encourage[d] patient to start a structured exercise program.  Patient was also instructed to maintain a low sodium, low

---

[19] Shortness of breath when lying flat; attacks of severe shortness of breath and coughing that generally occur at night, usually awakening the person from sleep; lightheadedness; fainting

[20]Regurgitation occurs when blood flows back through a heart valve as the leaflets are closing or blood leaks through the leaflets when they should be completely closed.

36

fat, low carbohydrate diet. . . . Patient is in a 4-step program to quit smoking."
Plaintiff's medications were continued with no changes.

On October 9, 2012, plaintiff saw Philip Kurle, M.D., a neurologist (Tr. at 538-541). Plaintiff reported that she had had a migraine "about every day for the past couple of months." Plaintiff reported an "episode" a couple weeks earlier during which she "got real hot then cold then dizzy." She described her migraine pain as a needle going through her eyeball. Plaintiff said Topamax made her moody and confused. "The patient has been started on a fentanyl patch [narcotic], but she does not feel that this has helped her insofar as her pain. She has ongoing neck and back pain. She is still using a lot of percocet [narcotic]." On exam plaintiff was pleasant but tired appearing, she was in no physical distress, she was alert and oriented with normal speech, her affect was somewhat depressive. She was assessed with "other forms of migraine, without mention of intractable migraine with status migrainous", fibromyalgia, other malaise and fatigue, unspecified back pain, and "unspecified abnormal function study of brain and central nervous system." Dr. Kurle ordered a follow up MRI of the brain and blood work.

On November 2, 2012, plaintiff saw Kathleen Robbins, M.D., for a one-month medication check (Tr. at 570-572). "Having severe migraines. Waiting to hear back from Dr. Kurle's office. He started her on Methylin [central nervous system stimulant] but it isn't being covered and she can't afford it. She is up and doing more with it." Plaintiff reported that she could not focus well. She reported neck pain. "Not sure if Duragesic patches are helping but feels she may need to give it more time." The

37

results of plaintiff's physical exam consisted of tenderness in her cervical and lumbar spine, and "overall appearance - normal."  No other exam or observations were noted. Dr. Robbins assessed fibromyalgia and told plaintiff to continue her "current medications."  She assessed "arthralgia - stable."  She assessed neck pain and told plaintiff to continue her duragesic patches for now.

On November 8, 2012, plaintiff had an MRI of her brain, which was unchanged compared to her last MRI on December 30, 2010 (Tr. at 551-554, 588-589, 703).  Dr. Kurle wrote, "Findings consistent with the patient's history of migraines.  Also signs of chronic sinus congestion.  All of which is unchanged from previous studies."  Plaintiff also had blood work which showed elevated blood sugar, elevated liver enzymes, and a negative rheumatoid factor (Tr. at 555-556).

On December 6, 2012, plaintiff saw Kathleen Robbins, M.D., for a one-month medication check (Tr. at 567-569).  "Doesn't feel like Fentanyl patches are working. Sometimes get nauseated with meds but not new."  Plaintiff's complaints consisted of blood in stool, constipation, nausea, headache, skin lesion, back pain and nausea.  The physical exam consisted of the following: overall appearance - normal; abdominal tenderness; tenderness in cervical and lumbar spine; 2 lesions on plaintiff's shoulder blade.  Dr. Robbins assessed fatigue.  "Medications refilled."

On January 3, 2013, plaintiff saw Kathleen Robbins, M.D., for a one-month medication check (Tr. at 564-566).  Plaintiff said it was hard to walk due to pain and "needles" in her feet.  "Stable on Ritalin for attention deficit."  Plaintiff reported difficulty concentrating, back pain, joint pain, neck pain and myalgia (muscle pain).  Plaintiff's

38

physical exam consisted of the following: Overall appearance - normal; extremities negative for edema; cervical spine - tender; lumbar spine - tenderness. Dr. Robbins assessed fibromyalgia and refilled plaintiff's Ritalin.

On January 16, 2013, plaintiff saw Robert Shemwell, DPM, to establish care (Tr. at 558). Plaintiff complained of pain, burning and numbness in her feet. "She takes a lot of medicine. . . . Upon examination she has all the symptoms of neuropathy. I am referring Patricia back to Dr. Robbins to treat her for a systemic condition and put her on a medicine for that."

On January 17, 2013, plaintiff saw Kevin Byrne, D.O., after having been referred by Dr. Robbins due to elevated liver function tests (Tr. at 644-645). Plaintiff reported smoking 1/2 to 1 pack of cigarettes per day and occasional alcohol use. She reported the following symptoms: chills, depression, dizziness, forgetfulness, loss of sleep, nervousness, chest pain, irregular heart beat, poor circulation, rapid heart beat, swelling of ankles, varicose veins, bowel changes, constipation, nausea, stomach pain, shortness of breath, shortness of breath while lying down, cough, and wheezing. On exam plaintiff was noted to be well appearing, in no distress, fully oriented, with normal mood and affect. Her neck was nontender, her cardiac exam was normal, her lungs were clear, her abdomen was nontender with normal bowel sounds, and she had no edema or varicosites in her legs. She was assessed with abnormal liver function study. The plan simply said, "Dr. Robbins."

That same day she saw Philip Kurle, M.D., a neurologist, for a follow up on her migraines (Tr. at 699-702). Plaintiff's caretaker came with her. "Patient states the

migraines have been terrible.  Patient states when people talk fast, she has difficult[y]

keeping up and understanding.  She becomes confused and ends up with a migraine."

Plaintiff indicated that her peripheral neuropathy throws off her balance when she walks

and that she "still experiences episodes of dizziness."  Plaintiff reported that the

Topiramate "which had been tried previously had caused mood changes and other

major side effects."

> Number of other anti-migrainous medications have been ineffective as well.  The
> patient does feel that the riboflavin that she had been taking in the past may
> have been of some moderate benefit for her migraines.  She was not however
> able to afford this.  We have not yet been able to get this supplement for her.
> She feels, however, that she would probably be able to afford it.
>
> The patient continues to complain of diffuse widespread pain affecting her entire
> body.  The patient continues to feel that, in sum, her pain remains 7-9/10 most of
> the time.  Overall, I have felt her symptoms are most suggestive of fibromyalgia.
> She has chronic fatigue.  She has a prior diagnosis of attention deficit disorder,
> but I am giving her methylphenidate [Ritalin] for both of these issues.  She feels
> that it is of moderate benefit for her alertness during the day.  She feels however,
> that probably her other medications are contributing to ongoing somnolence.
>
> She is using Lyrica, and feels that it is of moderate benefit.  She does however,
> think that it is less effective over time.  She feels that it may be contributing to
> ankle edema.  She brought in some pictures of her significantly swollen ankles.
> She has been on some furosemide [also called Lasix, a diuretic] for this.  It is not
> a problem for her today.
>
> The patient is taking hydrocodone/acetaminophen up to three times a day as
> needed. . . .
>
> The patient continues to complain of fairly severe pins and needles burning and
> tingling in her feet bilaterally.  She has previously had an EMG study performed
> by Dr. Sudhir Batchu of neurology.  This had demonstrated some mild
> dysfunction of the tibial and peroneal nerves, potentially consistent with a distal
> sensory polyneuropathy.  The etiology of this would be idiopathic[21] at present.

---

[21]Relating to or denoting any disease or condition that arises spontaneously or for
which the cause is unknown.

She has been to see a podiatrist since the last visit. She states that he "confirmed" that she has a polyneuropathy. It sounds as if he confirmed this based on physical examination (which she said was relatively brief). I have found mixed physical exam findings, suggestive of but not definitive for a polyneuropathy.

The patient has had some significantly elevated liver function studies. . . . I talked to the patient about this issue, and advised her to minimize her use of medication such as Percocet [narcotic] which contains acetaminophen. . . .

Plaintiff was described as pleasant and in no apparent distress, even though she described her constant pain as a 7-9 out of 10. "It was a little difficult to pin the patient down, again, in regards to sensation in her feet. Overall, however, I could not demonstrate definitive distal sensory shading for pinprick or temperature. That is to say that the patient felt that pin and cold metal applied to the upper legs and calves felt about the same as this stimuli when applied to the feet. There was some degree of moderately diminished vibratory sense. Romberg[22] testing is negative." Plaintiff's gait was described as slightly wide-based and unsteady. She was not able to tandem walk.[23] Dr. Kurle prescribed Zonisamide (anticonvulsant) and refilled plaintiff's Vitamin B-2 (Riboflavin). He told her to return in four months.

On January 22, 2013, plaintiff's lab work was positive for the Hepatitis C antibody (Tr. at 651). During the administrative hearing on August 27, 2013, it was confirmed that plaintiff has not received any treatment for Hepatitis C (Tr. at 718).

---

[22]A positive Romberg sign occurs when a patient becomes unsteady when standing with eyes closed. This implies a severe defect i postural sensation in the lower extremities.

[23]A method of walking where the tows of the back foot touch the heel of the front foot at each step.

41

On February 1, 2013, plaintiff saw Kathleen Robbins, M.D., for a one-month medication check and "needs handicap placard - unable to walk 50 feet without resting due to arthralgia and neuropathy." (Tr. at 561-562). Plaintiff said she would like to resume Wellbutrin due to depression and smoking. The physical exam section reads in its entirety: "Overall appearance - normal; cervical spine - tender; lumbar spine - tenderness." Dr. Robbins assessed fibromyalgia. "Medications refilled." Dr. Robbins filled out the Missouri Department of Revenue form to get plaintiff a disabled tag for her car by placing a checkmark by the following: "The person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." (Tr. at 643).

On March 17, 2013, plaintiff saw Kevin Byrne, D.O., for a follow up consultation on Hepatitis C (Tr. at 646-647). Plaintiff was noted to be a current every-day smoker. On exam she was noted to be well appearing, in no distress, fully oriented, with normal mood and affect. Her neck was nontender. Her heart exam was normal. Lungs were clear. Abdomen was nontender. Plaintiff was assessed with Hepatitis C and was noted to be "tolerating treatment," although none was identified.

On August 6, 2013, plaintiff saw Philip Kurle, M.D., for a follow up (Tr. at 695-698). Plaintiff continued to smoke and said she was trying to alternate cigarettes with electronic cigarettes. Plaintiff reported that the neuropathy in her feet had been very painful, her feet had been swelling and she had had difficulty walking. "Her migraines have gotten worse. She has one at this time." Plaintiff said her confusion was not as bad as it used to be "unless she gets a lot that comes at her at once." Plaintiff also

reported being very depressed. Plaintiff said that she has to care for her disabled husband. She said the Lyrica had been helpful but "she is no longer convinced that it is helpful." She said her knees go out on her and she has come close to falling. Her back was very painful and she was having trouble turning over at night. She had been using electronic cigarettes. Plaintiff reporting sleeping a lot during the day. Her headaches were worse in the summer. She had one for five days the previous week. "She is not using anything to treat most of these headaches." On exam Dr. Kurle wrote the following: "Generally, Ms. Weber is a pleasant but tired appearing, somewhat obese, 48-year-old woman who appears at times to be in some degree of distress. She winces as she tries to stand. She also winces as she lifts her arms. She is alert and oriented. Her affect is somewhat blunted. At times during our discussion about her pain and her overall situation, she became tearful. . . . There is some degree of give way weakness on strength testing of the upper extremities, which the patient attributes to pain. Her right elbow is particularly painful at present. Tinel's taps were negative. Coordination testing shows the patient to move very slowly, but her movements are accurate, for instance on the fine finger testing and rapid alternating movement testing. Gait appears vaguely antalgic but is otherwise reasonably well coordinated. Romberg testing is negative." Dr. Kurle told plaintiff to wean off Lyrica and he prescribed Cymbalta, he gave her a trial of Rizatriptan (generic Maxalt) to use at the onset of a severe migraine, and he recommended she get a criss-cross lumbar brace and different elbow braces. For all other diagnoses he told her to continue the same treatment. He told her to return in 4 months.

On August 28, 2013, Philip Kurle, M.D., completed interrogatory questions in connection with plaintiff's disability case (Tr. at 693-694). My initial observation is that the handwritten answers do not appear to have been written by Dr. Kurle, although he signed the form. He indicated that he has been treating plaintiff for migraines, fibromyalgia, and neuropathy. She has had problems treating these migraine headaches with medication. "Based upon your knowledge of Ms. Weber and her condition would it be consistent with her condition that she would have headaches up to three to four times per week? *Yes.* Would it be consistent with her condition for her to treat these headaches by getting into a dark room and lying down and taking medications? *Yes.*"

## C.    SUMMARY OF TESTIMONY

During the October 20, 2011, hearing before the Appeals Council remand, plaintiff appeared pro se (Tr. at 764). She was advised of her right to representation but elected to "go forward today and then -- and, you know, to see where it takes us" (Tr. at 766). Plaintiff read over the documents waiving her right to a representative and informing her that she could change her mind during the hearing, and signed those at the beginning of the hearing (Tr. at 767-769). Plaintiff then testified as follows:

Plaintiff was 46 years of age (Tr. at 774). She had four biological children, ages 31, 23, 20, and 18 (Tr. at 774-775). None of them live with plaintiff now but they did off and on after her alleged onset date of July 2008[24] (Tr. at 775). Plaintiff lives with her

---

[24]Plaintiff subsequently amended her alleged onset date to July 2010 which is the day she filed her Title XVI application.

husband in a mobile home that has a couple of steps in the front (Tr. at 776). If her back goes out, sometimes it is tough getting up the stairs (Tr. at 776). They have to park "a little bit away from the house" and she is out of breath by the time she reaches the door (Tr. at 777). Plaintiff has a driver's license with no restrictions (Tr. at 778). She has a car but seldom drives because of her medication (Tr. at 778). When she has to, she can drive the 40 miles to the hospital (Tr. at 779). Her husband usually does the driving (Tr. at 779). Plaintiff's husband is disabled due to emphysema (Tr. at 779). It took about 2 hours and 15 minutes for plaintiff to get to the administrative hearing, but she had to stop to go to the bathroom and to smoke (Tr. at 781). Her husband smokes as well (Tr. at 781).

Plaintiff has a GED (Tr. at 783). She stopped going to school because she got pregnant (Tr. at 783). She does not have any problems with reading, writing or math (Tr. at 783). "If I read through, I don't remember. Sometimes I can't comprehend what I read. Math is no problem. Sometimes, you know, I make mistakes like everybody, but --" (Tr. at 784).

Plaintiff was living off her husband's SSI disability income as well as her daughter's child support until she turned 18 and moved out (Tr. at 785). Plaintiff is covered by Medicaid (Tr. at 785). Plaintiff last worked as a secretary/bookkeeper on July 15, 2008, and lost that job when the company closed (Tr. at 786, 791). She worked full time but did not start that job until the end of March or beginning of April that year (Tr. at 787). Plaintiff thinks she may have looked for work after she lost that job, but she does not remember (Tr. at 793-794). Plaintiff's previous work was as a

secretary and a stay-at-home mother/ housewife (Tr. at 788). As a secretary, plaintiff was "up and down," she answered the phones, typed, used a computer, did some math (Tr. at 788-789). It was different every day -- if she wanted to stand, she could stand; if she wanted to sit she could sit (Tr. at 790).

Plaintiff can no longer work because she is on oxygen at night for sleep apnea,[25] she gets severe migraines, and she gets confused and overwhelmed especially with paperwork (Tr. at 795). Plaintiff gets poison ivy all the time and has to have steroids two or three times a year for that (Tr. at 807). Plaintiff suffers from anxiety but does not see any counselors or therapists (Tr. at 809). Plaintiff has been on Xanax for a long time (Tr. at 809). Sometimes she gets sleepy but she does not have any other adverse side effects from her anxiety medication (Tr. at 809). Plaintiff takes Percocet and muscle relaxers and they both relax her (Tr. at 810). Some days plaintiff gets up after taking her morning medication, some days she goes back to sleep (Tr. at 810). Her night habits are off and on (Tr. at 810).

Plaintiff's pain medication works (Tr. at 811). The Lidocaine patches help a lot (Tr. at 811). Plaintiff has pain in her back, joints, neck, and hip (Tr. at 812). Her joints are snapping (Tr. at 812). Both of her knees have given out (Tr. at 816). The pain is no different when plaintiff is lying down (Tr. at 812-813). Plaintiff has about two bad days a month when she does not want to get out of bed (Tr. at 814). When it is really bad, a muscle spasm will last about 20 minutes (Tr. at 814). Methocarbamol helps her muscle spasms (Tr. at 814). Plaintiff's pain ranges from 2 or 3 to a 9 or 10 (Tr. at 815). During

[25]Plaintiff's sleep study was negative for sleep apnea.

the hearing she had been sitting for an hour when the ALJ asked her about that, and she said that she took her medication before coming to the hearing (Tr. at 819). Plaintiff can stand or walk for 30 minutes at a time, and she would be able to do that for up to 2 hours per day (Tr. at 820).

Walking or anxiety cause plaintiff to be short of breath (Tr. at 822). Plaintiff has no trouble with personal care (Tr. at 822). She cooks about twice a week, making enough food for leftovers the other days (Tr. at 829, 830). She keeps a sink full of water and bleach to put her dishes in (Tr. at 830). Everyone washes his own dishes (Tr. at 830). Plaintiff does laundry, but her in-home aid helps her with that (Tr. at 830).

Plaintiff's father, William Marshland, testified as well. Mr. Marshland does plaintiff's shopping (Tr. at 833). Plaintiff sometimes has to sit to wash dishes (Tr. at 835). Plaintiff can no longer mow her yard or care for her three dogs, her cat and her parrot (Tr. at 835, 837). She feeds the dogs, but they run free (Tr. at 836). Sometimes plaintiff will fax a paper to her father and ask him to read it and explain it to her (Tr. at 836).

During the August 27, 2013, hearing, plaintiff (who had secured representation since her first hearing) testified; and Julie Bose a vocational expert, testified at the request of the ALJ. Interrogatories were provided by medical expert Anne Winkler, M.D., Ph.D., an internal medicine and rheumatology specialist.

1.      **Plaintiff's testimony.**

At the time of the hearing plaintiff was 48 years of age and is currently 51 (Tr. at 718). She was 45 on her alleged onset date. Plaintiff went to school through 9th or

10th grade and earned her GED the year she was supposed to graduate (Tr. at 718).
Plaintiff is covered by Medicaid (Tr. at 733).

Plaintiff has migraine headaches four or five times a week (Tr. at 719). At the
time of the hearing she estimated she had already had 12 or 13 migraines that month
(Tr. at 719). It had been a bad month (Tr. at 719). On an average month she has
about 10 migraines per month (Tr. at 719). Sometimes when plaintiff gets a migraine
she lies down or she tries to take what medicine she can (Tr. at 720, 731). She falls
asleep and wakes up a couple hours later (Tr. at 720-721). Light, noise and movement
affect her during a migraine (Tr. at 721). Lying down is not enough to get rid of her
migraine, she has to take a nap (Tr. at 733). Her concentration is poor during a
migraine (Tr. at 721). Sometimes when she gets a migraine she just goes around
complaining about it because it hurts (Tr. at 731). When she does not lie down during a
migraine, she sits in a chair and then goes to bed early (Tr. at 731). Dr. Kurle gave
plaintiff a new medication[26] for migraines but she had not had a chance to use it yet so
she did not know whether it would work (Tr. at 732). She said her caretaker had picked
it up the day before (Tr. at 732). The last medication she tried for migraines gave her
breathing problems and she passed out, fell and woke up on the floor (Tr. at 732).
Plaintiff had been prescribed Tramadol but she could not afford the $27 and her
insurance would not cover that cost (Tr. at 732).

---

[26]Dr. Kurle's record from August 7, 2013, states that he prescribed Rizatriptan
(generic Maxalt) to use at the onset of a severe migraine.

Plaintiff has issues with confusion but she does not know what causes it (Tr. at 721-722). She saw Dr. Adelman (a psychologist) twice in connection with her application for Medicaid (Tr. at 733). He recommended that she get more treatment which she did by talking to her friends, talking to a pastor, or talking to her family members (Tr. at 734). Plaintiff's kids are all adults and they come over to visit her (Tr. at 735). Plaintiff takes Wellbutrin for depression and Ritalin for ADHD (Tr. at 736). The Wellbutrin is also to help her cut down on smoking (Tr. at 737). She does not know how much she smokes; she estimated that "it's less than a pack a day, but --" (Tr. at 737). Plaintiff took Lyrica for a long time and she believes her body is now immune to it (Tr. at 737). "The weight gain has really, really made me depressed. And the Lyrica is a big part of that, they say." (Tr. at 737).

Plaintiff lives with her husband, and they just got a temporary roommate to help around the house (Tr. at 722). Plaintiff has someone from an agency come in to help her with bathing, making the bed, cleaning the floors, doing laundry, preparing meals, doing dishes, helping her with shopping and errands, and this has been going on for several years (Tr. at 722). A nurse also comes in every two weeks to fill plaintiff's medication containers, take her vitals, and give her an allergy shot (Tr. at 722-723).

Plaintiff sees Dr. Robbins about once a month for pain management (Tr. at 723). Plaintiff has pain in her joints and she drops things from time to time (Tr. at 723). Plaintiff has been seeing a podiatrist for her feet -- she has a hard time walking on them and cannot get out of bed without a walker (Tr. at 724). The pain in her feet is so bad that she cannot stand it, it is unbearable (Tr. at 725). She has a lot of swelling in her

49

feet and ankles (Tr. at 725). Her doctors do not know what is causing the swelling (Tr. at 725). One time plaintiff could not have testing done due to the swelling (Tr. at 725).

It hurts to lift a gallon of milk because of her joints and her back (Tr. at 726). On a good day plaintiff can stand for 10 to 20 minutes (Tr. at 726). After that, her feet and back hurt (Tr. at 726). Plaintiff has problems walking due to balance (Tr. at 726-727). She can only walk about 80 feet due to breathing issues (Tr. at 727). She props her feet up more than 50% of the time due to pain (Tr. at 729). Plaintiff testified that she can no longer user her wrist braces and is waiting on a new prescription -- her old ones no longer fit because she has gained so much weight[27] (Tr. at 727).

Plaintiff has had problems with her heart but has not called the doctor about it (Tr. at 738). She still has chest pains and breathing problems (Tr. at 738).

Plaintiff's medications cause her to be tired (Tr. at 729). She has fallen asleep sitting in a chair (Tr. at 730). Plaintiff does not sleep much at night, she is up and down -- then she is tired and does not want to get up and wants to sleep during the day (Tr. at 730). Her medications also make her very thirsty (Tr. at 739-740).

## 2. Medical expert testimony via interrogatories.

Plaintiff's medically determinable impairments include new onset Hepatitis C, mild chronic obstructive pulmonary disease, migrainous headaches, fibromyalgia, possible carpal tunnel syndrome, minimal lumbar and cervical degenerative disc disease, and stress urinary incontinence (Tr. at 670). None of these impairments meet

---

[27]Plaintiff weighed 201 pounds on November 17, 2010, the day Dr. Kurle recommended she wear wrist braces (Tr. at 489). On August 6, 2013, three weeks before her administrative hearing, plaintiff weighed 200 pounds (Tr. at 696).

or equal a listed impairment (Tr. at 671). "However, new hepatitis C & if undergoing treatment, it would be likely she would be unable to work even sedentary work until treatment (approximately 1 year) is over due to side effects from hepatitis C treatment." (Tr. at 671).

Dr. Winkler found that plaintiff could lift up to 10 pounds frequently and 20 pounds occasionally (Tr. at 672). Plaintiff could sit for 4 hours at a time and for 8 hours per day, stand for 3 hours at a time and for 6 hours per day, and walk for 3 hours at a time and for 6 hours per day (Tr. at 673). She does not need a cane to ambulate (Tr. at 673). She can occasionally climb stairs; frequently balance, stoop, kneel, crouch or crawl; but can never climb ladders or scaffolds (Tr. at 674). She can frequently reach overhead and continuously reach in all other directions, handle, finger, feel, push or pull (Tr. at 675). She can frequently use foot controls with either foot (Tr. at 675). She can never work at unprotected heights; can occasionally work around moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, or extreme cold; and she can frequently operate a motor vehicle or work around extreme heat (Tr. at 676). She is capable of performing activities like shopping, can travel without a companion, can ambulate without assistance, can walk a block at a reasonable pace on rough or uneven surfaces, can use standard public transportation, can climb a few steps at a reasonable pace with the use of a single hand rail, can prepare a simple meal, can care for her personal hygiene, and can sort, handle or use papers and files (Tr. at 677).

### 3.    Vocational expert testimony.

Vocational expert Julie Bose testified at the request of the Administrative Law Judge.  Plaintiff's past relevant work is secretarial, which is sedentary and semi-skilled (Tr. at 741).  It was not performed at the substantial gainful activity level, however, and plaintiff therefore has no past relevant work (Tr. at 741).

The first hypothetical involved someone who could lift 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours per day and 3 hours at a time; sit 8 hours per day and 4 hours at a time; no climbing scaffolds or ladders; occasional climbing on stairs and ramps; frequently reach, operate foot controls, operate a motor vehicle and be exposed to extreme heat; no work around unprotected heights; occasional exposure to moving mechanical parts, humidity and wetness, dust, odors, fumes, pulmonary irritants and extreme cold; limited to understanding, remembering and carrying out simple instructions consistent with unskilled work (Tr. at 742).

If the person could perform semi-skilled work, the person could do secretarial work; however, with the limitation of unskilled work, secretarial work could not be done (Tr. at 743).  The person could work as a counter clerk, DOT 249.366-010, light, unskilled, with 2,600 to 2,700 positions in Missouri and 106,309 in the country; labeler, DOT 920.587-014, with 1,100 to 1,200 in Missouri and 94,684 in the country; or mail clerk, DOT 209.687-026 with 1,300 to 1,400 in Missouri and 56,017 in the country (Tr. at 744).

The second hypothetical was the same as the first except the person would be limited to sedentary work instead of light, i.e., lifting up to 10 pounds maximum,

52

standing or walking 2 hours per day, and sitting 6 hours per day with a sit/stand option every 30 to 60 minutes while staying on task (Tr. at 744). Such a person could work as a call-out operator, DOT 237.367-014, with 1,300 to 1,400 in Missouri and 45,479 in the country; a document preparer, DOT 249.587-018, with 11,100 to 11,200 in Missouri and 292,166 in the country; or an addresser, DOT 209.587-010, with 1,400 to 1,500 in Missouri and 120,892 in the country (Tr. at 744-745).

The third hypothetical was the same as the second except the person could not walk more than 50 feet at a time (Tr. at 745). This additional walking limitation would not affect the person's ability to perform those same three sedentary jobs (Tr. at 745-746).

The fourth hypothetical involved a person who could sit for a total of 4 hours per day and stand or walk for 2 hours per day (Tr. at 746). The person could not work full time (Tr. at 746). If the person would be suffering from a migraine headache 5 to 12 days per month causing him to have to lie down a couple of hours during a work day, the person could not work (Tr. at 746-747). If the person would consistently miss two days of work per month, he could not work (Tr. at 747).

The final hypothetical was the same as the second except the person could only occasionally finger, feel, handle or reach -- such a person could not work (Tr. at 747-748). In order to perform the sedentary unskilled jobs listed above, the person would need to have concentration, persistence and staying on task approximately 85% of the time (Tr. at 749). A document preparer has no contact with the public (Tr. at 749). A call-out operator does (Tr. at 749). A document preparer requires no contact with

coworkers (Tr. at 750).  An addresser requires no contact with coworkers (Tr. at 750).
All of these positions require reading, writing and math at the level of 4th grade through
8th grade (Tr. at 750).

## V.    APPEALS COUNCIL REMAND AND FINDINGS OF THE ALJ

The Appeals Council entered an order vacating the first decision of the ALJ and
remanding the case on January 18, 2013 (Tr. at 63-65).  The Appeals Council directed
the ALJ to (1) evaluate plaintiff's mental impairment in light of the opinion of Steven
Adelman, Psy.D., and plaintiff's testimony regarding confusion, forgetfulness, trouble
spelling small words, poor memory and fluctuating moods; (2) reevaluate plaintiff's
allegation of worsening migraine headaches.

Administrative Law Judge Carol Boorady entered her opinion on November 4,
2013 (Tr. at 20-35).

Step one.  Plaintiff has not engaged in substantial gainful activity since her
alleged onset date (Tr. at 22).

Step two.  Plaintiff has the following severe combination of impairments:  right
peroneal axonal neuropathy, mild chronic obstructive pulmonary disease, migrainous
headaches, fibromyalgia, possible carpal tunnel syndrome, minimal lumbar and cervical
degenerative disc disease, history of dilated cardiomyopathy, Hepatitis C, major
depressive disorder, and panic disorder (Tr. at 22).  Plaintiff's attention deficit disorder
is controlled with medication and is therefore not a severe impairment (Tr. at 23).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr.
at 23-25).

54

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work except she can only perform minimal walking or standing so that she is not walking more than 50 feet at a time; she needs to alternate between sitting and standing every 30 to 60 minutes while staying on task; she can never climb ladders or scaffolds or work around unprotected heights; she can occasionally climb stairs or ramps, use foot controls, and have exposure to moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants and extreme cold; she can frequently reach with the upper extremities, operate a motor vehicle, and have exposure to extreme heat.  She is limited to occupations that require her to understand, remember, and carry out only simple instructions consistent with unskilled work (Tr. at 25).  With this residual functional capacity, plaintiff cannot perform any past relevant work (Tr. at 34).

Step five.  Plaintiff is capable of performing other jobs in significant numbers such as call out operator, document preparer, or addresser (Tr. at 34-35).

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.  First I will address plaintiff's specific complaints.

1.      Plaintiff takes issue with the ALJ's reliance on plaintiff's father's Function Report - Third Party dated August 17, 2010, with respect to whether plaintiff needed help with cooking.  However, on October 11, 2011 -- 14 months after the Third Party Function Report was completed -- plaintiff testified that she cooked about twice a week,

making enough to have leftovers the other days. Therefore, it is irrelevant what plaintiff's father reported in 2010.

2.     Plaintiff cites to the statements of an employee of Independent Living Resources Center and an LPN with regard to whether plaintiff is capable of performing activities of daily living. Those documents are dated August 23, 2013, and August 26, 2013; however, plaintiff alleges that she became disabled more than three years before that. During the intervening time, as the ALJ pointed out, plaintiff was on her roof cleaning gutters, and she admitted that she was able to drive when necessary, cook twice a week, do some housework, do dishes and do laundry. The ALJ also accurately pointed out that during the same month these documents were prepared in connection with plaintiff's disability case, she told her doctor that she was caring for her disabled husband.

3.     Plaintiff complains about the ALJ's reliance on plaintiff's statement to her doctor that she cared for her disabled husband, pointing out that plaintiff said in a Function Report that she and her husband help each other. However, the ALJ was entitled to rely on plaintiff's statement to a doctor in connection with treatment of her impairments when that conflicted with plaintiff's statement in an administrative report in support of her attempt to collect disability benefits.

4.     Plaintiff complains about the ALJ's reliance on plaintiff's getting up on her roof to clean gutters -- "it should be noted that Plaintiff was unsuccessful in this venture and suffered a fall and injury." However, plaintiff's fall was not caused by her inability to do that chore, her fall was caused by a branch breaking.

56

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and

Case 2:14-cv-04284-REL   Document 21   Filed 03/31/16   Page 57 of 67

additionally states that the following factors should be considered:  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are in part as follows:

> The claimant's daily activities are not consistent with her allegations that she has been unable to work.  At the first hearing, the claimant admitted that she could sit for 60 minutes at a time and could lift five to ten pounds.  She also stated at that time that on a typical day she would do some housework, prepare meals, and do dishes and laundry.  She also reported at the time she filed her application that she could drive and go out alone and that she was able to pay bills and handle money.  She reported visiting family and going to the post office regularly as well, and denied difficulty with memory, completing tasks, understanding, following instructions, using her hands or getting along with others.  In fact, in October 2010, the claimant was on her roof, cleaning gutters while using a branch to balance.  The claimant's father also reported at the time of the claimant's application that the claimant was able to perform her own personal care and prepare her own meals.  At the second hearing, the claimant testified that she gets help around the house from independent living services including chores meal preparation, dishes, shopping and errands.  However, she reported to her treating doctors as recently as August 2013 that she provided care for her disabled husband.

> I have also considered the claimant's allegations as to the duration, frequency and intensity of her symptoms, as well as precipitating and aggravating factors as noted above, but the claimant's medical treatment, the observations of medical professionals and her own admissions regarding her daily activities undermines her claims of severe symptoms keeping her from doing more than very minimal sitting, or from being able to concentrate.  As for medications, the claimant has been on a variety of mental health medications, inhalers and pain medications, but many of these appear to have been prescribed in response to subjective complaints rather than objectively verifiable symptoms.  As for treatment other than medication, the evidence shows that the claimant has not been hospitalized, undergone surgery or required any type of outpatient therapy

58

since her alleged onset date.  Overall, these factors further erode the credibility of the claimant's subjective complaints.

(Tr. at 31).

## PRIOR WORK RECORD

Plaintiff has almost no earned income and listed "stay at home mother/ housewife" as her occupation on many of her medical forms.  She left her last job when the company was sold, not due to any impairments.  This factor suggests that plaintiff is not employed for a reason other than her impairments and supports the ALJ's credibility determination.

## DAILY ACTIVITIES

As mentioned above, after her alleged onset date plaintiff was on her roof cleaning gutters.  Three years after her alleged onset date she told her doctor that she had to care for her disabled husband.  There is really not a substantial amount of evidence that plaintiff's daily activities are consistent with the ability or inability to perform substantial gainful activity.

## DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff consistently reported very severe and frequent symptoms that were not always confirmed by the medical evidence.

### Back pain:

An MRI dated May 7, 2010, showed only minimal disc bulge.  On May 27, 2010, she was nontender over her lumbar spine.  On August 12, 2011, plaintiff described her back pain as "bad."  On September 22, 2011, plaintiff had no tenderness on palpation,

Case 2:14-cv-04284-REL   Document 21   Filed 03/31/16   Page 59 of 67

no muscle spasm, and no costovertebral angle tenderness during a pre-operative physical. On June 29, 2012, Dr. Robbins observed lumbar spine tenderness. On August 2, 2012, plaintiff reported back pain but Dr. Robbins found no pain on inspection. On October 4, 2012, plaintiff said her back pain had gotten worse and was now severe. She said she was in tears at times due to pain. However, on exam, the only abnormality was tenderness in her lumbar spine; her fibromyalgia was found to be stable. On November 2, 2012, plaintiff had tenderness in her lumbar spine. On December 6, 2012, she had tenderness in her lumbar spine. On January 3, 2013, she had tenderness in her lumbar spine. On February 1, 2013, plaintiff had tenderness in her lumbar spine.

**Neck pain:**

An MRI of her neck dated May 7, 2010, was normal. X-rays dated August 2, 2010, showed only mild degenerative disc disease. An MRI of her neck dated August 9, 2010, was "totally normal." On October 1, 2011, plaintiff denied neck pain. On February 28, 2012, plaintiff reported having more neck pain. On November 2, 2012, plaintiff had tenderness in her cervical spine. On December 6, 2012, she had tenderness in her cervical spine. On January 3, 2013, she had tenderness in her cervical spine. On January 17, 2013, plaintiff's neck was nontender. On February 1, 2013, plaintiff had tenderness in her cervical spine.

**Headache:**

On November 17, 2010, plaintiff described her headache pain as a 10/10 at times. On June 3, 2011, she said her headache pain was a 5-6/10. On June 23, 2011,

60

plaintiff said she was applying for disability due to fibromyalgia and COPD, not because of migraines. On September 27, 2011, while in the hospital on another matter, plaintiff's migraines were described as stable. Four days later she had a "mild headache." On October 6, 2011, plaintiff described her migraines as unchanged and ongoing although they had improved to some degree. On February 28, 2012, plaintiff reported frequent migraine headaches. On June 26, 2012, she said she was having only 4 to 5 migraines per month but those were disabling. On August 2, 2012, plaintiff reported a headache but on exam Dr. Robbins noted no pain on inspection. On October 9, 2012, plaintiff reported that she had had a migraine about every day for the past couple of months. Plaintiff's MRIs confirmed the existence of migraines, according to her neurologist. However, on January 17, 2013, plaintiff said she had been having terrible migraines, that when people talk fast she would become confused and end up with a migraine. She described her migraine headache pain as a 7-9/10 most of the time, but was described as being pleasant and in no apparent distress. August 6, 2013, was the only time in this entire record that plaintiff complained of actually having a migraine headache while at a doctor's appointment -- despite her description of her migraine headache pain as a 7 to 10 out of 10 in severity, Dr. Kurle observed that plaintiff appeared to be pleasant and "at times" to be in some degree of distress. This does not seem to match plaintiff's description as unbearable disabling migraine headache pain. However, she did at times during the discussion become tearful (but her right elbow was noted to be "particularly painful at present" suggesting that her elbow was causing more distress than her alleged migraine headache at the time).

Case 2:14-cv-04284-REL   Document 21   Filed 03/31/16   Page 61 of 67

In addition, the ALJ noted that plaintiff had been treated for conditions which were diagnosed based only on plaintiff's subjective statements. For example, on November 17, 2010, testing revealed good attention. However, on June 26, 2012, plaintiff said she had always had some modest problems with attention and that Attention Deficit Disorder runs in her family. With no observations or testing revealing a deficit in attention, plaintiff was diagnosed with Attention Deficit and was put on Ritalin. Not surprisingly, on January 13, 2013, plaintiff's attention deficit disorder was noted to be stable. There is no other evidence of Attention Deficit Disorder; however, plaintiff was kept on Ritalin based on her statement that the disorder runs in her family.

### DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

It is undisputed that plaintiff's list of medications is long, and that she consistently reported myriad side effects with almost every medication she was ever prescribed. No doctor ever observed any of the alleged side effects, however, and on June 26, 2012, plaintiff said she thought the symptoms she originally attributed to side effects were probably due to reasons other than her medications. This suggests plaintiff may have, on other occasions, incorrectly assumed that medications were causing side effects.

On November 2, 2012, plaintiff said that Methylin was working and she was up and doing more with it, but that she could not afford it. She continued to smoke, however. On January 17, 2013, plaintiff said the Riboflavin was working to help her migraines, but she could not afford it -- but she continued to purchase cigarettes. There was never any reason stated for an inability to afford medication. In fact, one of the prescriptions plaintiff claimed not to be able to afford cost $27 according to the record;

yet plaintiff continued to finance her daily smoking habit during the entire length of this record, against medical advice.

**6.    FUNCTIONAL RESTRICTIONS**

Other than after surgery or an acute injury, plaintiff's activities were not restricted by her doctors.  In fact, Dr. Khan encouraged plaintiff to begin a structured exercise program.

**B.    CREDIBILITY CONCLUSION**

Plaintiff's credibility is a difficult question.  The <u>Polaski</u> factors above do not clearly support or detract from the ALJ's credibility determination.  In addition, there are other instances in the record suggesting an exaggeration of symptoms or their severity. For example, on October 4, 2012, plaintiff told Dr. Robbins that her pain was severe, she had pain in all of her joints, and she was in tears at times due to pain.  That same day she saw Dr. Kahn and denied muscle or joint pain and stiffness.  Plaintiff's neurologist indicated that it was a little difficult to pin plaintiff down as far as her description of her symptoms of sensation in her feet -- his testing did not match her description of her symptoms.  And plaintiff's description of practically being bed-ridden due to her pain contradicts her decision to climb on top of her roof to clean her gutters.

The substantial evidence standard used by the court in a disability appeal presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991); <u>Clarke v.</u>

Case 2:14-cv-04284-REL   Document 21   Filed 03/31/16   Page 63 of 67

Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988). Therefore, because the evidence supports the ALJ's finding, even though it may also support an opposite finding, I must affirm the ALJ's credibility determination.

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of plaintiff's treating physician, Kathleen Robbins, D.O., and her treating neurologist, Philip Kurle, M.D. On November 21, 2010, Dr. Robbins completed a Medical Source Statement and found that plaintiff could not sit for more than 4 hours in an entire workday. Her other findings do not appear to be relevant to the outcome, so I will limit my discussion to this one functional restriction.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable

64

medical source is familiar with the other information in the case record. 20 C.F.R.

§§ 404.1527, 416.927.

Not much discussion is needed with respect to the opinion of Dr. Robbins. Her medical records were typically no more than a line or two long, she rarely recorded any observations or findings, she rarely performed any examination, her assessments frequently were unrelated to any complaint or observation, and in no record prepared by Dr. Robbins does plaintiff ever complain of difficulty sitting, exhibit any difficulty with sitting, or have any test results which would suggest a difficulty sitting. Furthermore, in a Function Report prepared by plaintiff shortly before Dr. Robbins completed this Medical Source Statement, plaintiff said that her impairments do not affect her ability to sit. The ALJ properly gave no weight to the opinion of Dr. Robbins.

Dr. Kurle, plaintiff's neurologist, signed interrogatory questions dated August 28, 2013, in which he agreed that plaintiff's condition would be consistent with having migraine headaches 3 to 4 times a week requiring her to lie down in a dark room. This is significant because the vocational expert testified that if a person were to have a migraine headache 5 to 12 days per month causing him to have to lie down a couple of hours during a work day, the person could not work, and if the person were to miss 2 days of work per month, he could not work.

The ALJ had this to say about Dr. Kurle's opinion:

[L]ittle weight has been given to the August 28, 2013 opinion of Phillip Kurle, M.D., the claimant's treating neurologist. Again, this opinion is not well supported or consistent with the other substantial evidence in the case record. This opinion is provided on a checkbox form submitted to the claimant's neurologist by the claimant's attorney. Even if the claimant was having

65

headaches at the frequency noted by Dr. Kurle at the time he filled out this form, the evidence does not support that the claimant has had them at this frequency for a period of 12 months or longer. The claimant reported that her migraines were worse over the summer of 2013, but that she was not taking medications for them at that time.

(Tr. at 32).

I conclude that the ALJ's finding with respect to Dr. Kurle's opinion is not supported by the evidence. Dr. Kurle treated plaintiff from November 17, 2010, through the date of his opinion, or almost three years. He saw her regularly during that entire time. He is a neurologist and treated her for migraine headaches, which is the subject of his opinion. It is not as easy to find medical support for migraine headaches as opposed to other conditions; however, Dr. Kurle found that plaintiff's brain MRIs were consistent with migraine headaches because the lesions in her brain can be (and he believed were) caused by migraine headaches. Dr. Kurle's opinion is consistent with the record as a whole, because plaintiff complained to nearly all of her doctors of frequent migraine headaches, whether those doctors were treating her for migraines or not. This certainly spanned more than 12 months.

The ALJ's observation that plaintiff did not take medication for her migraines during much of this record, and she never went to the emergency room because of a disabling migraine headache is noted; however, the record does reflect that plaintiff was prescribed many medications but found them intolerable for one reason or another.[28] The record also reflects that plaintiff did not go to the emergency room for anything,

---

[28]I do not find plaintiff's argument that she could not afford medications persuasive -- plaintiff was covered by Medicaid during all of these years and she was able to finance a very heavy smoking habit to the exclusion of purchasing prescription medications.

which is consistent with her lack of emergency room treatment for migraines. In fact, plaintiff suffered a fractured fibula after falling off the roof of her house and did not go to the emergency room until two weeks later, the only emergency room visit in the record.

Although Dr. Kurle's opinion was provided on a check-mark form prepared by plaintiff's attorney and the answers to the questions do not appear to be in his handwriting, he did sign the form indicating that he agrees with its contents. I find that the substantial evidence in the record as a whole does not support the ALJ's decision to give little weight to the opinion of Dr. Kurle.

The vocational expert testified that someone likely to have a migraine 5 to 12 times per month requiring her to lie down in a dark room would not be able to work. Because this testimony is consistent with the opinion of Dr. Kurle, I find that the ALJ erred in finding plaintiff not disabled.

## VIII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that the decision of the Commissioner is reversed. It is further

ORDERED that this case is remanded for an award of benefits.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 31, 2016